**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 18, 2013

No. 11-20323

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

JOHN FLUELLEN HEARD, JR.; GARY LEE LAMBERT,

Defendants–Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before DAVIS, OWEN, and SOUTHWICK, Circuit Judges.

OWEN, Circuit Judge:

Appellees John Fluellen Heard, Jr. and Gary Lee Lambert were convicted of conspiracy to defraud the United States by failing to pay and impeding the IRS's collection of employment taxes. Heard was also convicted of two counts of tax evasion, one count of bribery of a public official, one count of willfully making and subscribing to a false return, and one count of corrupt interference with internal revenue laws. Both raise a number of challenges to their respective convictions and sentences. We affirm.

**I**

Heard, a former police officer, has been in the private security business for a number of years. Lambert is a certified public accountant (CPA). In the mid-

No. 11-20323

1980s, Heard started his own private-security company.  Lambert allegedly became associated with Heard a few years later when they incorporated a company named Guardex, Inc.  Between the years of 1988 and 2000, Heard, Lambert, or both reincorporated and changed the name of Heard's security company multiple times.  Over those years, Heard and Lambert were involved in incorporating the following companies: Guardex, Inc. and Guardex II, Inc., which did business under the name Guardex; Probe Protection; Investigation, Protection & Security, Inc., Industry Protection Services, Inc., and International Private Security, all of which could use the acronym "IPS"; Beltran's Security & Investigation Agency, an El Paso company that Heard purchased and later reincorporated; and Superior Protection, Inc. (SPI).  International Private Security and Beltran were later merged into SPI.  There was evidence that Lambert handled payroll and accounting for Guardex, Probe, the various IPS entities, and Beltran.  He apparently was also the CFO of SPI from 1999 to 2000, and he told an IRS agent that he remained a consultant for a period of time thereafter.

The Government alleged that over the course of eighteen years, Heard, Lambert, and other defendants conspired to defraud the United States out of millions of dollars in employment taxes withheld by Heard's security companies. Overall, the Government alleges that the companies failed to pay a substantial sum in employment taxes, totaling over $5 million.  According to the Government, the conspirators opened and closed all of these corporations, changed company names, moved physical locations, used different versions of the company names, signed documents with fictitious names, and used mail drops to prevent the IRS from discovering the individuals operating these companies and collecting the unpaid employment taxes.  On appeal, neither Heard nor Lambert challenges the existence of a conspiracy to defraud the United States.

No. 11-20323

The Government presented evidence that Heard diverted funds from his corporations to finance his lavish lifestyle, including purchasing a steer at the Houston Livestock Show and Rodeo. There was evidence that Heard had his employees cash corporate checks, often signed using a stamp with a fictitious name made in the course of the conspiracy, and give the money to him. This behavior formed the basis of the two tax evasion charges. The Government put on evidence that Heard failed to report distributions from SPI in 2001 and 2003. The Government has noted evidence that Heard filed false tax returns in other years as well.

The Government has also alleged that Heard bribed a public official, Michael Czecholinski, an employee of Federal Protective Services who ensures compliance with government contracts. It alleged that Heard provided an airline ticket, lodging, the chance to play in a charity golf tournament, and future employment to Czecholinski in exchange for Czecholinski providing a favorable reference for SPI to a General Services Administration (GSA) contracting official and providing pre-signed cards indicating that Heard's security guards complied with government contracts.

After trial, Heard was sentenced to a total of 151 months in prison, three years of supervised release, and ordered to pay almost $9 million in restitution, jointly and severally with his wife, Janet Heard, who was also a defendant in the case, and Lambert. Lambert was sentenced to 51 months in prison, three years of supervised release, and was ordered to pay restitution of almost $2.5 million, for which he is jointly and severally liable with Heard.

## II

Heard raises two challenges to his conviction for bribery of a public official. First, he argues that the evidence was insufficient to convict him of bribery because there was no evidence of a *quid pro quo*. He argues that the evidence was sufficient to convict him at most of providing an illegal gratuity to a public

No. 11-20323

official.   Second, he argues that the district court erred in admitting the lay opinion testimony of one of his former employees.

## A

Heard was charged with both bribery of a public official in violation of 18 U.S.C. § 201(b)(1) and providing an illegal gratuity to a public official in violation of 18 U.S.C. § 201(c)(1).   The bribery statute, § 201(b)(1), makes it a crime to "directly or indirectly, corruptly give[] . . . anything of value to any public official . . . with intent . . . to influence any official act."   The illegal gratuity statute, § 201(c)(1),  makes it a crime to "directly or indirectly give[] . . . anything of value to any public official . . . for or because of any official act performed or to be performed by such public official."   Bribery, in requiring that the defendant intend to influence an official act, therefore requires "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act."[1]   We have held, at least in the context of a conviction for honest-services fraud through bribery, that if a *quid pro quo* is required, it is not required that the parties to the bribe have identified a particular official act, but only that the Government "prove the 'specific intent to give or receive something of value *in exchange* for an official act' to be performed sometime in the future."[2]   An illegal gratuity, on the other hand, does not require a *quid pro quo* because it does not require the intent to influence any official act and can take the form of "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken."[3]   An illegal

---

[1] *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999); *see also United States v. Tomblin*, 46 F.3d 1369, 1379 (5th Cir. 1995).

[2] *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009) (quoting *Sun-Diamond*, 526 U.S. at 404-05) (assuming without deciding that *Sun-Diamond* applies in the context of honest-services fraud through bribery)

[3] *Sun-Diamond*, 526 U.S. at 405.

4

No. 11-20323

gratuity still requires a link between something of value and a specific official act—it is not enough that the gratuity was given because of the official's office.[4]

Heard argues that his conviction for bribery should be reversed because there was insufficient evidence for the jury to find the requisite *quid pro quo* beyond a reasonable doubt. We review the denial of a motion for a judgment of acquittal de novo.[5] "A motion for acquittal should be granted if the government fails to present evidence sufficient for a reasonable jury to have found that each essential element of the offense was established beyond a reasonable doubt."[6] We evaluate the evidence in the light most favorable to the verdict.[7]

There was sufficient evidence here for a reasonable jury to convict Heard. There was evidence that while there were bids for government contracts pending on which Czecholinski was listed as a reference, Heard had one of his employees, William Lane, call Czecholinski to offer him a chance to play in a charity golf tournament. Czecholinski eventually accepted, and Heard paid for Czhecholinski's travel and lodging expenses and invited him to play in a golf tournament with country singer Tracy Lawrence. Heard did the same thing a year later. During the time between the two golf trips, Czecholinski gave SPI a favorable recommendation on the pending contracts, but Lane testified that SPI was not deserving of Czecholinski's recommendations. The next year, Heard again paid for Czecholinski to travel to play in the golf tournament. Lane

---

[4] *Id.* at 405, 414.

[5] *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012) (per curiam) (citing *United States v. Campbell*, 52 F.3d 521, 522 (5th Cir. 1995) (per curiam)).

[6] *Id.* (citing *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998) (per curiam)).

[7] *United States v. McCauley*, 253 F.3d 815, 818 (5th Cir. 2001) (citing *United States v. Odiodio*, 244 F.3d 398, 400-01 (5th Cir. 2001)).

No. 11-20323

testified that he and Heard had previously discussed that Czecholinski could put in a good word for them, and that in Lane's opinion, by inviting Czecholinski to play in the golf tournament, they were trying to get a favorable recommendation. He said that he did not believe Czecholinski would have received anything if he were not able to make recommendations for future contracts, and Heard never paid for Lane's expenses for a golf tournament as he did for Czecholinski. Once Heard learned that he was under investigation, he falsely told a government agent that Czecholinski had been on a business trip to Houston at the time of the golf tournament, and Heard instructed Lane to tell Czecholinski to use this "cover story."

Heard argues that the evidence of intent to influence Czecholinski is circumstantial, and that the evidence adduced could support an innocent explanation, such as the friendly relationship between Lane and Czecholinski. We see no reason why direct evidence is required. Indeed, "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods."[8] Furthermore, although the evidence adduced could support an innocent explanation, it does not compel that conclusion. Viewing the evidence in the light most favorable to the verdict, the jury could find the requisite *quid pro quo*.

Heard also argues that in determining whether the evidence was sufficient, we should draw an adverse inference against the Government because of its failure to call Czecholinski as a witness. While we have previously applied the missing-witness rule in reviewing a district court's factual findings,[9] Heard has not pointed to any case in which we have disturbed a jury verdict because of a party's failure to call a witness. Heard neither argued for application of the

---

[8] *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment).

[9] *See United States v. Wilson*, 322 F.3d 353, 363-64 (5th Cir. 2003).

missing-witness rule in moving for a judgment of acquittal, nor requested that the jury be given a missing-witness instruction. We therefore do not deem it appropriate to apply the rule in reviewing the sufficiency of the evidence. Even if Heard had sought application of the missing-witness rule below, we would not apply it here. An adverse inference is not appropriate when the witness is equally available to both parties.[10] There is no indication that at the time of trial Czecholinski still had any connection to the Government and no reason to expect that his testimony, if given, would corroborate the Government's theory of the case.[11] Indeed, according to the Government and not disputed by Heard, Czecholinski had completed his term of probation and the statute of limitations had expired at the time of trial. If Heard believed that Czecholinski's testimony would favor him, he was free to call Czecholinski.

Heard also argues that Czecholinski was not performing an "official act" when he gave a favorable recommendation. The definition of "official act" is quite broad, encompassing "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."[12] We have recognized that the definition is intended to "include any decision or action taken by a public official in his capacity as such," and official acts are "not limited to those within the official's specific authority."[13] In a somewhat similar situation, we held that

---

[10] *United States v. Chapman*, 435 F.2d 1245, 1247 (5th Cir. 1970).

[11] *See United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009) (holding that the district court did not err in instructing the jury not to draw any adverse inferences from the government's failure to call a witness because the witness did not have a relationship with the government such that one would expect him to give testimony in favor of the government).

[12] 18 U.S.C. § 201(a)(3).

[13] *United States v. Parker*, 133 F.3d 322, 326 (5th Cir. 1998) (internal quotation marks omitted).

No. 11-20323

a congressman was performing an official act when he attempted to use his influence to get the Air Force to award a food-services contract to a private contractor.[14]  Czecholinski, as a government employee in charge of assessing SPI's performance on government contracts, was in a similar position to influence the award of future contracts to SPI.  We therefore reject Heard's argument that Czecholinski was not performing an official act.

Finally, we reject Heard's argument that the jury necessarily found that he did not act "corruptly" because, in addition to bribery, it found him guilty of providing an illegal gratuity.  Neither a corrupt intent nor the lack thereof is an element of providing of an illegal gratuity, so the jury made no finding regarding whether Heard acted corruptly in finding him guilty of that offense.

**B**

Heard argues that the district court erred in admitting Lane's testimony that he thought he and Heard were trying to get a good recommendation from Czecholinski because it was inadmissible lay opinion testimony.  We review evidentiary rulings for abuse of discretion.[15]  If there was error, then the court must determine whether the error affected the defendant's substantial rights.[16]  "An error affects substantial rights if there is a reasonable probability that the improperly admitted evidence contributed to the conviction."[17]

---

[14] *United States v. Bustamante*, 45 F.3d 933, 938 (5th Cir. 1995); *see also United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision.").

[15] *United States v. Diaz*, 637 F.3d 592, 599 (5th Cir. 2011).

[16] *Id.*; *see also* FED. R. EVID. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . .").

[17] *Diaz*, 637 F.3d at 599 (quoting *United States v. Sumlin*, 489 F.3d 683, 688 (5th Cir. 2007)) (internal quotation marks omitted).

No. 11-20323

The Federal Rules of Evidence permit a lay witness to give opinion testimony if it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[18] We have previously held that lay witnesses are permitted to give opinion testimony on a defendant's mental state.[19]

The district court did not abuse its discretion in admitting Lane's opinion testimony. In response to a question regarding his opinion, based on his observations and knowledge, regarding why Heard paid for Czecholinski's expenses, Lane replied, "Well, it was my opinion that we were trying to get a favorable recommendation." This testimony was rationally based on Lane's perception. He had worked with Heard for three years, had conversations with Heard about Czecholinski, and made the arrangements for Czecholinski to play in the golf tournament. His opinion was helpful to the jury for similar reasons. Because of his experience working with Heard and his conversations with Heard, he was in a unique position to observe Heard's demeanor, which the jury could not do.

*United States v. Ruppel*,[20] cited by Heard, does not persuade us to hold otherwise. In that case, we expressed reservations about lay opinion testimony, especially with respect to the defendant's intention or state of mind.[21] However, we ultimately determined that the district court did not abuse its discretion in admitting the testimony at issue. Therefore, *Ruppel* does not help Heard.

---

[18] FED. R. EVID. 701.

[19] *See Diaz*, 637 F.3d at 600; *Hansard v. Pepsi-Cola Met. Bottling Co.*, 865 F.2d 1461, 1466-67 (5th Cir. 1989).

[20] 666 F.2d 261 (5th Cir. Unit A 1982).

[21] *Id.* at 269-70.

No. 11-20323

## III

Heard next raises two challenges to his sentence. First, he argues that the district court procedurally erred in calculating his advisory Guidelines range. He also challenges his sentence as substantively unreasonable.

## A

Heard argues that the district court procedurally erred in calculating his recommended sentencing range under the United States Sentencing Guidelines by enhancing his base offense level by two pursuant to Guidelines § 2T1.1(b)(1). The Guidelines provide for a two-level increase to the base offense level for tax evasion, which is the offense that drove Heard's Guidelines calculation, when "the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity."[22] According to the commentary, "'[c]riminal activity' means any conduct constituting a criminal offense under federal, state, local, or foreign law."[23] This provision is included for deterrence purposes.[24] Whether income was derived from criminal activity is a factual determination we review for clear error.[25]

Heard argues that the § 2T1.1(b)(1) enhancement was improper because it can only apply when the money was obtained by some illegal means, and the income here was legitimate income earned from security-guard services. According to Heard, the fact that the money was not reported is not sufficient—it must have been obtained illegally. Allowing the enhancement here amounts to "double counting" because his tax evasion is being punished twice. The

---

[22] U.S. SENTENCING GUIDELINES MANUAL § 2T1.1(b)(1) (2010).

[23] *Id.* cmt. 3.

[24] *Id.* cmt. background.

[25] *United States v. Roush*, 466 F.3d 380, 387 (5th Cir. 2006) (citing *United States v. Creech*, 408 F.3d 264, 270 n.2 (5th Cir. 2005)).

No. 11-20323

Government argues that the money was obtained illegally because it was embezzled from Heard's employees.  Specifically, it argues that Heard's companies did not report the employment taxes withheld, preventing the employees from receiving credits for those taxes withheld,[26] and Heard diverted some of those funds for his own use without reporting them as income.  In the district court, the Government's argument was similar, although its focus was different.  Instead of arguing that Heard embezzled from his employees, it argued that Heard stole from the IRS by withholding in excess of $10,000 in employment taxes in 2003 and not paying the money to the IRS.

Application of the § 2T1.1(b)(1) enhancement was proper here. We find the Government's argument before the district court persuasive, and we may affirm on any ground in the record.[27]  The enhancement was not applied here, as Heard argues, merely because the funds were not reported on his personal tax return.  Rather, the illegality of the funds is demonstrated by Heard's other tax convictions, which concern interference with the IRS's collection of these employment taxes.  Even if Heard had reported the withheld employment taxes as income, they would still have been derived from his conspiracy to defraud the United States.  The facts contained in the presentence investigation report (P.S.R.), which have not been challenged on appeal, show that over the course of the conspiracy, Heard's companies failed to pay to the IRS millions of dollars in employment taxes.  There was evidence that in 2003, SPI failed to pay over $2 million in payroll taxes.  An IRS revenue agent testified that Heard received unreported distributions from SPI of $629,000 in 2003.  Heard's expert witness even admitted that the distributions that Heard received in 2003 could have

---

[26] *See* 26 C.F.R. § 1.31-1(a) ("If the tax has actually been withheld at the source, credit or refund shall be made to the recipient of the income even though such tax has not been paid over to the Government by the employer.").

[27] *United States v. Jackson*, 453 F.3d 302, 308 n.11 (5th Cir. 2006).

No. 11-20323

been used to pay the payroll taxes due, and he testified that using over $500,000 to pay personal expenses from SPI when SPI owed about $450,000 in the first quarter of 2003 "wasn't probably the most prudent thing to do" and that the law would require SPI to pay employment taxes before paying personal expenses. In this situation, it was not clear error for the district court to find that, instead of paying employment taxes, Heard used the money to pay personal expenses and that Heard failed to report those diverted funds as income on his personal tax return.

Heard's double-counting argument is unpersuasive. As noted above, the unreported funds were illegally derived because they were withheld from the IRS, not merely because they were unreported. Furthermore, to the extent that Heard is arguing that the conduct underlying his convictions relating to the illegal retention of employment taxes cannot be used to enhance the base offense level for his tax evasion conviction his argument fails. Heard cites *United States v. Haltom*, in which we held that, under the language of the Guidelines, the district court should have grouped a defendant's mail fraud conviction and tax evasion conviction.[28] We noted the grouping rules had the effect of preventing the mail-fraud offense from counting twice toward the defendant's offense, once as the stand-alone offense, and once as a § 2T1.1(b) enhancement to the tax evasion offense.[29] No analogous problem is presented here. The district court grouped all of the tax offenses, preventing any of those offenses from counting twice. On appeal, Heard has not asserted that they were improperly grouped.

**B**

Heard argues that his sentence is substantively unreasonable. This circuit applies a presumption of reasonableness to a sentence that falls within the

---

[28] 113 F.3d 43, 46-47 (5th Cir. 1997).

[29] *Id.*

No. 11-20323

Guidelines range.[30] "The presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors."[31] We generally review the substantive reasonableness of a sentence for abuse of discretion under the totality of the circumstances.[32] However, the Government contends that Heard has not preserved his claim of substantive reasonableness because he failed to object on that ground below. This court requires an objection to preserve a claim that the sentence is substantively unreasonable.[33]

Heard asserts that by requesting a below-Guidelines sentence, he adequately objected to the reasonableness of his sentence. This argument fails. We held in *Peltier v. United States* that the defendant did not preserve the issue of substantive reasonableness by requesting a below-Guidelines sentence.[34] Heard also argues that he objected to the substantive reasonableness of his sentence when, in response to the district judge asking whether there were any other objections, his counsel responded, "Not other than those already argued, Judge." However, all of his prior objections were either Guidelines-related or a request for a below-Guidelines sentence—none were related to substantive reasonableness. Finally, Heard argues that his counsel adequately objected by noting that the sentence imposed is "extensive." That statement was made while

---

[30] *United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011) (citing *United States v. Gutierrez-Hernandez*, 581 F.3d 251, 254 (5th Cir. 2009)).

[31] *Id.* (quoting *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009)) (internal quotation marks omitted).

[32] *United States v. Hernandez*, 633 F.3d 370, 375 (5th Cir. 2011).

[33] *United States v. Peltier*, 505 F.3d 389, 391-92 (5th Cir. 2007).

[34] *Id.*

No. 11-20323

arguing for bond on appeal and was not an objection. Therefore, we will review Heard's sentence for plain error.[35]

The district court calculated the advisory Guidelines range to be 151-188 months of imprisonment, and the court imposed a sentence of 151 months of imprisonment for the conviction of aiding and abetting bribery of a public official. The district court also imposed statutory maximum sentences of 60 months for conspiracy to defraud the United States, 60 months for each of the two tax evasion counts, 36 months for the count of willfully making and subscribing to a false tax return, and 36 months for corrupt interference with internal revenue laws, all to run concurrently with the 151-month sentence. The bribery conviction carried a 15-year maximum term of imprisonment (180 months).[36]

Heard asserts that his sentence is unreasonable because if he had been sentenced for bribery alone, the Guidelines range would have been 15-21 months of imprisonment. He argues that the district court effectively circumvented the statutory maximums on the tax counts by sentencing him to 151 months of imprisonment for the bribery offense.

The district court correctly calculated the advisory Guidelines range to be 151-188 months of imprisonment, as Heard concedes. The offense level for the tax counts was 34, which combined with his criminal history, resulted in the 151-188 months advisory range. The offense level for the bribery count was 14. The Guidelines provide in § 3D1.4 that if the offense level for one group of related counts is more than 9 levels lower than that of the group with the highest offense level, the lower offense level will have no effect on the calculation

---

[35] *Id.* at 392.

[36] *See* 18 U.S.C. § 201(b).

of the combined offense level.[37]  Accordingly, the bribery count did not affect the computation of the 151-188 month range.  From this properly calculated range, the district court then selected a 151-month sentence as the total punishment after considering the factors in 18 U.S.C. § 3553(a).[38]

In subsequently imposing a 151-month sentence for the bribery count, the district court adhered to the sentencing procedure contemplated by § 5G1.2 of the Guidelines.  Section 5G1.2 provides that when there are multiple counts of conviction, the sentence imposed on each count shall be equal to the total punishment, in this case 151 months, unless a count is subject to a statutory maximum or minimum sentence.[39]  That section further provides that "[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently."[40]  That is precisely what occurred in this case since the statutory maximum for the bribery count was 180 months of imprisonment. However, even if there had been no bribery count, the district court was authorized to order consecutive sentences on the other counts up to the total punishment of 151 months of imprisonment.[41]  In short, the district court committed no error, let alone plain error, in sentencing Heard to 151-months in

---

[37] U.S. SENTENCING GUIDELINES MANUAL § 3D1.4(c) (2010).

[38] *See id.* § 5G1.2 cmt. n.1 ("The combined length of the sentences ('total punishment') is determined by the court after determining the adjusted combined offense level and the Criminal History Category and determining the defendant's guideline range . . . .").

[39] *Id.* § 5G1.2(b).

[40] *Id.* § 5G1.2(c).

[41] *Id.* § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

No. 11-20323

prison, with or without the bribery conviction.[42]  Heard does not discuss or even cite § 5G1.2 of the Guidelines.

Heard also contends that the 151-month sentence for the bribery count is too harsh because the evidence showed the bribe was minor and Heard presented extensive mitigating circumstances.  The evidence reflects that the tax loss was over $5 million and the district court did not plainly erred in applying the factors set forth in § 3553(a).

Lane and Czecholinski, who were both involved in the bribe, received 24 months and 36 months of probation respectively.  Heard challenges his 151-month prison sentence as an unwarranted disparity.  However, Heard was the leader of a conspiracy that spanned 20 years and involved numerous tax offenses in addition to the bribery offense.  Lane and Czecholinski pleaded guilty to misdemeanor gratuity offenses.  Heard pleaded not guilty and was convicted of six felony counts after an 18-day trial.  There was no plain error in treating the defendants differently.

## IV

Lambert argues that the district court should have granted his motion for judgment of acquittal based on his withdrawal defense.  Relatedly, he argues that the district court erred in instructing the jury on his withdrawal defense based on a six-year statute of limitations rather than a five-year statute of limitations.  We consider his latter challenge first.

### A

Lambert submitted a requested jury instruction for his withdrawal defense based on the general five-year statute of limitations found in 18 U.S.C. § 3282(a).

---

[42] *See United States v. Williams*, 602 F.3d 313, 319 (5th Cir. 2010) (noting that "the district court [may] impose[] consecutive sentences on each count, under the terms of § 5G1.2(d) of the sentencing guidelines . . . to produce a combined sentence equal to the total punishment").

No. 11-20323

The refusal to give a proposed jury instruction is reviewed for abuse of discretion.[43] Reversal is not warranted unless the proposed instruction "(1) is substantially correct, (2) is not substantively covered in the jury charge, and (3) pertains to an important issue in the trial, such that failure to give it seriously impairs the presentation of an effective defense."[44]

The statute of limitations for conspiracy to defraud the United States in violation of 18 U.S.C. § 371, the offense for which Lambert was charged, is six years "where the object of the conspiracy is to attempt in any manner to evade or defeat any tax or the payment thereof."[45] Lambert was charged with conspiracy to defraud the United States by preventing the IRS from "ascertaining, computing, assessing, and collecting revenue, to wit: employment taxes." The six-year statute of limitations applies to such an offense.

In support of his argument that the five-year statute of limitations applies, Lambert cites *United States v. Ely,* in which the defendant was charged under 18 U.S.C. § 371 with conspiring with an IRS agent to disclose taxpayer information in violation of 26 U.S.C. § 7213(a)(1).[46] The decision in *Ely* is inapposite.

**B**

Lambert argues that the district court erred in denying his motion for judgment of acquittal based on his withdrawal from the conspiracy. Notably, he has not argued on appeal that the evidence was insufficient for a jury to find that he was ever part of the conspiracy.

---

[43] *United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010).

[44] *Id.* (quoting *United States v. Webster*, 162 F.3d 308, 321-22 (5th Cir. 1998)).

[45] 26 U.S.C. § 6531(8); *see also United States v. Aubin*, 87 F.3d 141, 145 (5th Cir. 1996) (applying a six-year statute of limitations to a tax-related charge under 18 U.S.C. § 371).

[46] 140 F.3d 1089, 1089 (5th Cir. 1998) (per curiam).

No. 11-20323

The statute of limitations for a conspiracy charge begins to run when the defendant withdraws from the conspiracy.[47]   Because Lambert was indicted on October 9, 2008, and a six-year statute of limitations applies, he must have withdrawn by October 9, 2002.  Ordinarily we review the denial of a motion for a judgment of acquittal de novo, determining whether the evidence was sufficient for the jury to find that each element of the offense is satisfied beyond a reasonable doubt.[48]   However, in this circuit, withdrawal is an affirmative defense, and the burden of proof is on the defendant.[49]   Consequently, Lambert's conviction should only be vacated if no reasonable trier of fact could have failed to find that Lambert's withdrawal from the conspiracy by October 9, 2002, was established by a preponderance of the evidence.[50]

"[A] defendant is presumed to continue his involvement in a conspiracy unless he makes a substantial affirmative showing of 'withdrawal, abandonment, or defeat of the conspiratorial purpose.'"[51]   In order to show withdrawal, "the defendant must show that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a

---

[47] *United States v. Gornto*, 792 F.2d 1028, 1033 (11th Cir. 1986) (collecting cases); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 465 n.38 (1978).

[48] *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012) (per curiam).

[49] *See United States v. Willis*, 38 F.3d 170, 179 (5th Cir. 1994) ("Since a justification defense such as duress is an affirmative defense, the burden of proof is on the defendant.  To succeed, the defendant must prove each element of the defense by a preponderance of the evidence." (internal citation omitted)); *United States v. MMR Corp. (LA)*, 907 F.2d 489, 499 (5th Cir. 1990) (withdrawal is an affirmative defense).

[50] *See United States v. Barton*, 992 F.2d 66, 68-69 (5th Cir. 1993) (holding that, in reviewing a defendant's motion for judgment of acquittal based on insanity, which the defendant must prove by clear and convincing evidence, the court must determine whether no reasonable jury "could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence.").

[51] *United States v. Mann*, 161 F.3d 840, 859-60 (5th Cir. 1998) (quoting *United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir. 1994)).

18

manner reasonably calculated to reach conspirators."[52]    Mere cessation of activity in furtherance of the conspiracy is not sufficient to show withdrawal.[53]

There was some evidence suggesting that Lambert withdrew from the conspiracy before October 9, 2002.   It is undisputed that SPI paid all employment taxes from 1999 to 2002, apparently because SPI began using a payroll service in 1999.  There is evidence that Lambert became the CFO of SPI in 1999, and left that job in 2000.  He remained as a consultant, but the evidence is conflicting as to whether he left that position in 2001 or 2004.  Two former employees testified that they thought Lambert was in charge of payroll taxes, and an IRS revenue officer determined that Lambert could be held responsible for an alleged underpayment of payroll tax in 2000.  Lambert's expert witness similarly testified that Lambert "had the authority to act and did, in fact, act with regard to [SPI] during the period of—starting in about October of 2000 and going forward until another five quarters, roughly."  There was evidence that in 2000, SPI obtained a loan to provide temporary working capital, and the loan was guaranteed by personal assets in Lambert's brokerage account at the bank.  The loan was repaid, and one witness testified that Lambert cashed in his securities account to repay it.   There was also some evidence that Lambert borrowed $100,000 from a friend in 2000 and told the friend that he was going to use it to pay payroll taxes.  From this evidence, the jury might conclude that when Lambert became an employee of SPI in 1999, he turned over a new leaf and decided to begin operating SPI in compliance with the law.

However, there is very little evidence indicating that Lambert was actually the person that decided SPI should pay its employment taxes—it very well may have been Heard.  There was testimony that Heard kept very tight control of

---

[52] *Id.* at 860.

[53] *United States v. Torres*, 114 F.3d 520, 525 (5th Cir. 1997) (citing *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981)).

financial matters and generally was the one who decided whether to pay payroll taxes, even when his CFO was an experienced accountant. Lane testified that titles were not very important at Heard's companies. Heard even appointed multiple employees as CFO, some of whom had no financial experience.

There was also evidence from which the jury could find that Lambert did not withdraw. One employee testified that when Lambert discovered that Heard's newly acquired company had not paid payroll taxes in 1998, the year before he began working at SPI, Lambert became frustrated not because a company should pay its employment taxes, but because the company had paid taxes in the past and ceasing payment would raise red flags with the IRS. That same employee testified that in July 2002, Heard, Lambert, and the employee were walking out of the building after Heard had recently been contacted by an IRS criminal investigator. Heard stated that he would put the blame on Lambert, and Lambert would disappear for a while. Lambert did not say anything. The employee testified that Heard told her that Lambert had previously disappeared. There was other testimony from one of Heard's employees in the mid-1990s that it was known around the office that Lambert would disappear during tax time. Finally, there was evidence that during a meeting with the IRS in 2004, when Lambert was asked if he had been involved with other companies that had tax problems, he disclosed one company but failed to mention Guardex, Probe Protection, the three IPS entities, and Beltran, all of which had tax problems with the IRS.

Although is it a close question, we conclude that the district court did not err in denying Lambert's motion for a judgment of acquittal. Although a jury could reasonably have found that he withdrew, the evidence is not so clear-cut that the jury was required to find withdrawal.

Lambert argues that the evidence shows that he required Heard to dispose of all stamps with fake names, merge all of his security companies into SPI, and

outsource payroll.  There was evidence that there were no fake names on signature cards after 1997, that Heard's security companies merged into SPI, and that SPI used a payroll service.  However, none of this evidence was linked to efforts by Lambert.

## V

Lambert argues that the district court erred in allowing evidence that he committed bankruptcy fraud in connection with a bankruptcy petition he filed in 1994 to discharge several personal debts to the IRS.  The district court admitted the testimony because it is either intrinsic evidence of Lambert's intent, and thus not subject to Federal Rule of Evidence 404(b), or alternatively, extrinsic evidence, and proper notice was given in accordance with Rule 404(b).  The Government presses both arguments on appeal.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act" is not admissible as character evidence, but such evidence may be admissible for another purpose, such as intent.[54]  In a criminal case, upon request of the defendant, the government must provide reasonable notice of the general nature of such evidence before trial, or during trial if the district court excuses pretrial notice for good cause.[55]  This court has set forth a two-part analysis to determine whether evidence is admissible under Rule 404(b).  "First, it must be determined that the extrinsic offense is relevant to an issue other than the defendant's character.  Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403."[56]  Intrinsic evidence is generally admissible and is not

---

[54] FED. R. EVID. 404(b)(1).

[55] *Id.* 404(b)(2).

[56] *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978).

subject to Rule 404(b).[57]  Evidence of other acts is intrinsic "when the evidence of the other act and evidence of the crime are 'inextricably intertwined' or both acts are part of  a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."[58]

The Government argues that evidence of bankruptcy fraud is intrinsic because it "completes the story of the conspiracy and provides valuable context."[59] This argument hinges on the fact that when Lambert filed for bankruptcy to discharge his personal taxes, he was in charge of payroll and financial matters for Probe Protection.  However, there is no evidence linking Lambert's 1994 bankruptcy petition in any way to Probe's employment tax issues.  Thus, it cannot be said that the false bankruptcy petition and the conspiracy were inextricably intertwined, part of a single criminal episode, or that the bankruptcy was a necessary preliminary to the conspiracy.

The evidence is, however, admissible under Rule 404(b) as evidence of Lambert's intent with respect to the conspiracy.  The evidence is relevant to show Lambert's intent to further the objective of the conspiracy[60]—defrauding the United States out of employment taxes.  We have previously held that in a conspiracy case, the defendant puts his intent into issue when he pleads not guilty.[61]  Here, it is more likely that Lambert intended to further the objective

---

[57] *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005).

[58] *Id.* (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)).

[59] *See United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996) ("[Intrinsic] evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place.").

[60] *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 839 (2013) ("Conspiracy actually has two intent elements—intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense.").

[61] *United States v. Gadison*, 8 F.3d 186, 192 (5th Cir. 1993); *United States v. Prati*, 861 F.2d 82, 86 (5th Cir. 1988).

No. 11-20323

of defrauding the United States out of employment taxes when he was, at the same time, defrauding the United States out of income tax through a fraudulent bankruptcy.

Lambert argues that the evidence fails the first part of *Beechum*'s test because the government did not offer sufficient evidence to establish that Lambert committed bankruptcy fraud.[62]   However, the government offered testimony that in the bankruptcy petition, Lambert estimated his income from 1992 to 1994 to be about $9,000 per year and listed no other assets.  His wife testified that in August 1994 they bought a home for which he contributed $70,000 to $90,000 in cash.  She also testified that Lambert owned a corporation called Tuna Dog, and this corporation was not disclosed on the bankruptcy petition.   The home was purchased in the name of Tuna Dog.   There was evidence that both Lambert and Tuna Dog received checks over a two-and-a-half month period in 1994 totaling $7,500 and $6,000 respectively.   The government also entered into evidence a 1996 brokerage account application in which Lambert indicated Tuna Dog had an annual income of over $100,000 and a net worth of $500,000.   Based on this evidence, a reasonable jury could find that Heard's bankruptcy petition was fraudulent.

Lambert also argues that the district court should have excluded the evidence pursuant to Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice.[63]   In performing a Rule 403 analysis, the court must balance the "incremental probity of the evidence . . . against its potential for undue prejudice."[64]  While it is a close case,

---

[62] *See United States v. Beechum*, 582 F.2d 898, 912-13 (5th Cir. 1978) ("[A]s a predicate to a determination that the extrinsic offense is relevant, the Government must offer proof demonstrating that the defendant committed the offense.").

[63] FED. R. EVID. 403.

[64] *Beechum*, 582 F.2d at 914.

23

we hold that the district court did not abuse its discretion. The alleged bankruptcy fraud occurred in the middle of the ongoing conspiracy and served to deprive the IRS of taxes owed, just as the conspiracy at issue here deprived the IRS of taxes. Lambert argued at trial that he did not intend or agree with Heard to evade the payment of employment taxes. We think this evidence is probative enough of Lambert's intent that it was not an abuse of discretion to admit it.

Finally, Lambert argues that, even if the evidence is admissible as extrinsic evidence, he did not receive written notice, and thus the evidence should have been excluded. Rule 404(b) requires that the government give reasonable notice of the general nature of any Rule 404(b) evidence. The Advisory Committee Notes indicate that no specific form of notice is required, and other circuits have agreed.[65] The rule is intended to "reduce surprise and promote early resolution on the issue of admissibility."[66]

We first note that the Government was not required to give Lambert *written* notice—Rule 404 contains no such requirement. The Government argues that it gave Lambert notice of its intent to offer evidence of his bankruptcy well in advance of trial. According to the Government, it provided the bankruptcy petition in discovery. It also provided Lambert with a copy of its proposed trial exhibits three weeks before trial, listing the bankruptcy petition, and it represented to the district court that it gave Lambert's counsel a copy of the exhibit. Lambert has not disputed any of these representations. Lambert even filed a motion in limine before trial seeking, among other things, to exclude

---

[65] FED. R. EVID. 404 advisory committee's note, 1991 amendments; *United States v. Blount*, 502 F.3d 674, 678 (7th Cir. 2007); *United States v. Gorman*, 312 F.3d 1159, 1163 (10th Cir. 2002) (holding that verbal notice was sufficient).

[66] FED. R. EVID. 404 advisory committee's note, 1991 amendments.

evidence that Lambert "filed bankruptcy in 1994 and lawfully discharged a prior IRS assessment for his personal taxes."

We have doubts about whether the Government's notice was sufficient. While Rule 404 requires that the Government give notice only of the "general nature" of the evidence, the Government here did not indicate that it intended to show that the bankruptcy was fraudulent. However, we hold that any lack of notice here did not affect Lambert's substantial rights.[67] Lambert was on notice that evidence of the bankruptcy would be raised well in advance of trial. The Government indicated in its response to Lambert's motion in limine that it would present evidence that the bankruptcy was fraudulent two days before it did so. Furthermore, there was extensive evidence that Lambert was involved in the conspiracy with Heard, including evidence of the creation of signature stamps with fake names used to sign paychecks and tax documents, the destruction of tax documents, and his role in the repeated incorporation of Heard's companies. While the case was much closer with respect to Lambert's withdrawal, the 1994 bankruptcy petition is irrelevant to that issue. We therefore hold that any error in finding sufficient notice was harmless.

## VI

Lambert argues that his Confrontation Clause rights were violated when the district court refused to allow him to cross-examine an IRS revenue agent about the agent's dismissal, which was converted to a suspension of approximately five months without pay, for viewing pornography on his computer during business hours. Lambert also argues that such evidence was admissible under Rule 608(b) of the Federal Rules of Evidence. The district court excluded the evidence both because it was not probative of the agent's

---

[67] *See id.* 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of a party . . . .").

character for truthfulness and because any probative value was substantially outweighed by unfair prejudice.

An alleged violation of the Confrontation Clause is reviewed de novo, subject to harmless-error review.[68]  If there is no constitutional violation, then the court reviews limitations on cross-examination for abuse of discretion, "which requires a showing that the limitations were clearly prejudicial."[69]

"The Confrontation Clause is satisfied where defense counsel has been allowed to expose the jury to facts from which the jury 'could appropriately draw inferences relating to the reliability of the witness.'"[70] Of particular importance to the Confrontation Clause is evidence tending to show bias or motivation of a witness to testify.[71]  However, the right to cross-examination is not unlimited. "The district court has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"[72]

Lambert's Confrontation Clause rights were not violated.  Lambert argues that inquiry into the agent's suspension tends to show bias because he was suspended during the IRS investigation of Heard's companies.  Lambert claims that during that time period, a number of Heard's employees contacted the IRS to implicate Heard in wrongdoing, and this put the agent in the position of

---

[68] *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008).

[69] *Id.*

[70] *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004) (quoting *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993)).

[71] *Skelton*, 514 F.3d at 442 (citing *Alaska v. Davis*, 415 U.S. 308, 316-17 (1974)).

[72] *Id.* at 439 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

trying to "curry favor with the federal government in order to get reinstated and maintain his job." This argument is unpersuasive. As the government notes, the evidence shows that the Heard employees Lambert identified met with the agent in 1999, while the misconduct occurred in 2000 and the suspension began in 2001, so those interviews would not have been affected by the agent's suspension. Any argument that the suspension would cause the agent to falsify his testimony in 2010, nine years later, to curry favor with his employer is similarly unpersuasive. A reasonable jury would not "have received a significantly different impression of [the agent's] credibility had [Lambert] been permitted to pursue his proposed line of cross-examination."[73] Because evidence of the suspension was simply not relevant to the agent's bias or motivation for testifying, the limitation on cross-examination was not clearly prejudicial, and thus not an abuse of discretion.

Lambert also argues that this evidence was admissible under Federal Rule of Evidence 608(b), which allows inquiry into specific instances of conduct if probative of the witness's character for truthfulness or untruthfulness. He argues that limiting cross-examination was "clearly prejudicial."

"Rule 608(b) authorizes inquiry only into instances of misconduct that are clearly probative of truthfulness or untruthfulness, such as perjury, fraud, swindling, forgery, bribery, and embezzlement."[74] A district court has substantial discretion in admitting testimony under Rule 608(b).[75] The agent's conduct is not clearly probative of truthfulness or untruthfulness. The actions at issue are nothing like perjury, fraud, swindling, forgery, bribery, or

---

[73] *Van Arsdall*, 475 U.S. at 680.

[74] *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995) (quoting *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981)) (internal quotation marks omitted).

[75] *United States v. Farias-Farias*, 925 F.2d 805, 809 (5th Cir. 1991).

embezzlement. The district court therefore did not abuse its discretion in excluding the evidence.

Even if it were error to exclude the testimony, we are convinced that the error would be harmless beyond a reasonable doubt.[76] The agent's testimony focused on his examination of the employment taxes of Beltran, the IPS entities, Probe Protection, Falcon Computer Components, and a few of Heard's personal tax returns. The agent testified how he reconstructed the wages paid by Heard in 1995, and he was able to be cross-examined on his methodology. Heard's filings for other years indicating that he owed taxes but did not pay them were in evidence, so the agent's testimony on this point was cumulative. Lambert also has not disputed that these companies failed to pay employment taxes. In his direct testimony, the agent's only mention of Lambert was that Heard told him that Lambert prepared Heard's personal tax returns. On cross-examination, the agent confirmed that Lambert was present at some of the agent's meetings with Heard. The agent further testified that Lambert was responsible for paying Falcon's taxes, but also stated that he found no material issues with Falcon's taxes. In these circumstances, any error was harmless beyond a reasonable doubt.[77]

## VII

Lambert contends that the district court erred in excluding testimony of two witnesses concerning Lambert's history of ensuring that their payroll taxes were paid. One witness started to testify that Lambert had helped him take care

---

[76] *See Van Arsdall*, 475 U.S. at 684 (holding that the improper denial of a defendant's opportunity to impeach for bias is subject to harmless-error review in which the reviewing court must determine if the error was harmless beyond a reasonable doubt).

[77] *Id.* at 684 (the factors governing whether an error is harmless include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case").

of his taxes for his company in the past, and that he always filed his taxes every year.    Another witness would have testified that Lambert had been his accountant for over thirty years, had always paid his payroll taxes, and there had never been any problems.  The district court excluded the evidence because the fact that Lambert sometimes did not commit a crime is not necessarily evidence that he did not commit a crime here.

Lambert argues that the evidence is admissible as habit evidence.  Federal Rule of Evidence 406 provides that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."[78]  "To offer evidence of a habit, a party must at least demonstrate a 'regular practice of meeting a particular kind of situation with a specific type of conduct.'"[79] "[H]abit suggests a regular response to a repeated specific situation that has become semi-automatic."[80] "Although a precise formula cannot be proposed for determining when the behavior may become so consistent as to rise to the level of habit, 'adequacy of sampling and uniformity of response' are controlling considerations."[81]

The district court did not abuse its discretion.  There is no indication of how many clients Lambert has had in his career, but establishing that he had

---

[78] FED. R. EVID. 406.

[79] *Jones v. S. Pac. R.R.*, 962 F.2d 447, 449 (5th Cir. 1992) (quoting *Reyes v. Mo. Pac. R.R. Co.*, 589 F.2d 791, 794 (5th Cir. 1979)).

[80] *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 442 (5th Cir. 2007) (quoting *Reyes*, 589 F.2d at 794) (internal quotation marks omitted); *see also Mobil Exploration and Prod. U.S., Inc. v. Cajun Constr. Servs., Inc.*, 45 F.3d 96, 99 (5th Cir. 1995) (holding that, with respect to a business's routine practice, "the plaintiff must show regularity over substantially all occasions or with substantially all other parties with whom the defendant has had similar business transactions").

[81] *Reyes,* 589 F.2d at 795 (quoting FED. R. EVID. 406 advisory committee's notes, 1972 proposed rules).

always filed payroll taxes for two of them does not provide an adequate sample for showing habit.[82]  There has not been a showing that payment of payroll taxes had become an "invariable, reflexive response" to any kind of stimulus,[83] and it might be doubted whether such an involved action as filing and paying taxes could be considered a habit.

## VIII

Finally, Lambert challenges his sentence for conspiracy to defraud the United States as substantively unreasonable.  After a downward departure of two levels, the district court calculated Lambert's advisory Guidelines range as being 51 to 60 months of imprisonment.  The district court sentenced Lambert to fifty-one months of imprisonment.  Unlike Heard, Lambert has preserved his objection to the substantive reasonableness of his sentence.  We therefore review his sentence for an abuse of discretion.[84]

Lambert first argues that his sentence is unreasonable because it resulted in an unwarranted sentence disparity among him, Heard, and Janet Heard, a codefendant not involved in this appeal.  Heard received a total sentence of 151 months, although for the conspiracy charge, he received the statutory maximum of 60 months.  Information regarding Janet Heard's sentence is not in the record, but according to the briefs, she received six months of incarceration and six months of home confinement.  She was convicted of the conspiracy count as well as five counts of making a false oath in bankruptcy.

---

[82] *Leonard*, 499 F.3d at 442 (holding that a district court abused its discretion in admitting comments an insurance agent made to five clients over the course of a decade when the record demonstrated the agent had sold nearly two hundred such policies).

[83] *Id.*

[84] *United States v. Gutierrez-Hernandez*, 581 F.3d 251, 254 (5th Cir. 2009) ("We apply a presumption of reasonableness to guideline sentences and review for abuse of discretion sentences that include an upward or downward departure as provided for in the guidelines.").

No. 11-20323

We have held that a defendant may be able to establish substantive unreasonableness due to unwarranted sentence disparity based on a similarly situated defendant's sentence.[85] However, "a mere disparity of sentences among co-defendants does not, alone, constitute an abuse of discretion."[86]

Lambert is not similarly situated to Heard. Although Heard received only 60 months of imprisonment on the conspiracy count, only nine more than Lambert, he received a total sentence of 151 months, 100 more months than Lambert.

It is difficult to determine whether Lambert is similar to Janet Heard because of the lack of information regarding her sentencing in the record. A number of differences are evident, however. The indictment does not charge Janet Heard with any act in furtherance of the conspiracy until 2002, while it charges Lambert with committing an overt act as early as 1988. These difference alone likely make the two not similarly situated. Without any other information demonstrating their similarity, we cannot say that the district court abused its discretion.

Lambert also asserts that he argued four valid grounds for a variance in his sentencing memorandum. He argues that the following factors support a downward variance: (1) cooperation with the government, (2) lack of motive and role in the offense evidenced by his lack of profit, (3) his imperfect withdrawal and attempt to mitigate, and (4) his generosity, poor health, and senior age. In essence, Lambert is asking the court to reweigh the § 3553(a) sentencing factors. As we have previously held, "[a]ppellate review is highly deferential as the sentencing judge is in a superior position to find facts and judge their import

---

[85] *United States v. Armstrong*, 550 F.3d 382, 406 (5th Cir. 2008).

[86] *United States v. Ochoa*, 667 F.3d 643, 651 (5th Cir. 2012) (quoting *United States v. Lemons*, 941 F.2d 309, 320 (5th Cir. 1991)) (internal quotation marks omitted).

under § 3553(a) with respect to a particular defendant."[87]  We will not disturb Lambert's sentence.

*     *     *

For the foregoing reasons, we AFFIRM the convictions and sentences of Heard and Lambert in all respects.

---

[87] *United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).