**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 13, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 01-10340

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MILENA FLOYD,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before JOLLY, HIGGINBOTHAM, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Milena Floyd ("Floyd") was convicted by a jury of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, and one substantive count of mail fraud, aiding and abetting, in violation of 18 U.S.C. §§ 1341 & 2. Floyd was sentenced to a total of 63 months imprisonment, five years supervised release, restitution in the amount of $8,717,912.01 joint and several with her co-defendants, and a special assessment of $200. Floyd appeals her convictions and sentence. For the following reasons, we affirm Floyd's convictions, vacate her sentence and remand for re-sentencing.

FACTUAL AND PROCEDURAL BACKGROUND

Floyd's convictions stem from an insurance fraud scheme involving staged automobile accidents. Some of the accidents involved unsuspecting victims, while others involved only participants in the scheme. After each accident, the so-called "injured" participants would visit a law office and a chiropractic clinic in Dallas, both of which were embroiled in the scheme. The "injured" participants would run up substantial false medical bills, then a lawyer would make a demand on an insurance company and collect a settlement. In Dallas, four law firms and six chiropractic clinics were involved in the scheme, including the Stemmons Health Center where Floyd was employed. Portions of the scheme were undertaken by participants in Los Angeles, such as the preparation of medical bills from documents sent from the clinics in Dallas.

"Cappers" were responsible for recruiting individuals to participate in the scheme as crash "victims." These "victims" were instructed to visit an assigned chiropractic clinic 30 times and complain of an injury. When a "victim" did not want to visit the clinic anymore, the clinic employees would have the "victim" sign several papers reflecting visits that never occurred. The Government alleged that Floyd was one of the clinic employees who asked patients to sign for multiple phony clinic visits. Floyd denied any involvement in the scheme.

On appeal, Floyd argues that: (1) the district court erred by improperly admitting extrinsic evidence involving staged car accidents that occurred in Los Angeles and Houston, (2) the prosecutor's leading questions and improper statements denied her a fair trial, (3) the evidence was insufficient to sustain her convictions, (4) the district court erred in enhancing her sentence for more than minimal planning, (5) the district court erred in enhancing her sentence for having an aggravated role in the scheme, (6) the enhancements to her sentence violated her due process rights, and (7) the

district court erred in assigning criminal history points for a prior conviction. For the following reasons, we affirm Floyd's convictions, vacate her sentence and remand to the district court for re-sentencing.

DISCUSSION

I.    Fed. R. Evid. 404(b)

We review the district court's decision to admit evidence under Fed. R. Evid. 404(b) for abuse of discretion. United States v. Gonzalez, 76 F.3d 1339, 1347 (5th Cir. 1996). In criminal cases, our review is "necessarily heightened." Id. Because the harmless error rule applies, we will affirm evidentiary rulings "unless the district court abused its discretion and a substantial right of the complaining party was affected." United States v. Powers, 168 F.3d 741, 748 (5th Cir. 1999).

This Court uses a two-part test to determine the admissibility of evidence under Rule 404(b):[1]

First, the extrinsic offense evidence must be relevant to an issue other than that defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must also meet the other requirements of Fed. R. Evid. 403.[2]

---

[1] Fed. R. Evid. 404(b) states as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[2] Fed. R. Evid. 403 states as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

United States v. Bentley-Smith, 2 F.3d 1368, 1377 (5th Cir. 1993). In United States v. Beechum, we explained that "as a predicate to a determination that the extrinsic offense is relevant, the Government must offer proof demonstrating that the defendant committed the offense. If the proof is insufficient, the judge must exclude the evidence because it is irrelevant." 582 F.2d 898, 912-13 (5th Cir. 1978) (en banc). "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." Huddleston v. United States, 485 U.S. 681, 689 (1988).

Floyd argues that the district court erred in admitting extrinsic evidence of staged automobile accidents that occurred in Los Angeles and Houston during 1994 and 1995. Floyd asserts that the evidence was not relevant because there was insufficient proof that Floyd committed those offenses. Floyd further contends that the evidence was improper character evidence and unduly prejudicial because its connection to Floyd's alleged illegal conduct in Dallas was purely speculative.

The Government put forth evidence from Sadar Hogue ("Hogue"), a "capper," who testified that the same scheme had been run in Houston and in Los Angeles. Hogue testified that prior to working at the Stemmons clinic in Dallas, Floyd worked at Bellaire Health Care in Houston doing the same thing she did in Dallas, i.e. she made sure that all the "victims" came to the clinic to get their paperwork done and she got all the paperwork ready to be sent to Los Angeles where the medical bills were prepared. Hogue testified that Floyd was his clinic contact in Houston, and again in Dallas. Hogue further testified that Floyd told him she had participated in a staged accident in Houston and another in Los Angeles. The Government offered evidence of insurance claims pertaining to these two accidents which involved circumstances similar to the staged accidents in Dallas. Hogue testified that Floyd asked him to arrange for her to participate in a staged accident in Dallas as well.

4

The Government argues that it submitted sufficient evidence to show that the Houston and Los Angeles accidents involved Floyd and that they were staged. We agree. We further agree with the Government that the evidence concerning these accidents was relevant to Floyd's intent and knowledge of the scheme, issues at the heart of this case because Floyd denied that she knowingly did anything wrong.[3] Accordingly, we find that the district court did not err in admitting evidence concerning the staged accidents in Houston and Los Angeles.[4] Moreover, in light of the 404(b) instruction given by the district court, and the probative value of this evidence as it pertains to Floyd's intent and knowledge of the scheme, we are persuaded that admission of the 404(b) evidence was not unduly prejudicial. See United States v. Saucedo-Munoz, 307 F.3d 344, 350 (5th Cir. 2002).

## II.    Leading Questions/Improper Remarks

Floyd argues that the prosecutor improperly posed leading questions to its witness, Igor Basovich ("Basovich"), supplanting information that Basovich would not have otherwise have known. "Improper prosecutorial comments require reversal only if the comments substantially affected the defendant's right to a fair trial."[5] United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th

---

[3] Floyd argues that the prosecutor's statement "Look into her character," made during closing argument, shows that the evidence was submitted solely to show Floyd's bad character. We do not agree. Floyd reads this statement out of context. The Government did not argue that the Houston and Los Angeles accidents were evidence of Floyd's bad character.

[4] The Government alternatively argues that the evidence was not extrinsic because the indictment charged Floyd with partaking in a conspiracy that began around August 1993 and continued to July 1996 in Dallas "and elsewhere." Because we have found that the Houston and Los Angeles evidence was properly admitted extrinsic evidence under Rule 404(b), we need not address this argument.

[5] The Government contends that we should apply an abuse of discretion standard to the district court's decision to permit or exclude leading questions. See Fed. R. Evid. 611(c); Stine v. Marathon Oil Co., 976 F.2d 254, 266 (5th Cir. 1992). We disagree. Floyd does not argue that the district court erred by permitting or excluding leading questions. Rather, Floyd's argument that the prosecutor's impermissible leading questions unduly prejudiced her is more akin to an allegation of improper

5

Cir. 1990). In determining to what extent the defendant's right to a fair trial has been affected, we consider three factors: "the magnitude of the prejudicial effect of the remarks, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt." Id.

In this case, the prosecutor asked Basovich if he recognized anyone in the courtroom as being part of the scheme. Basovich indicated Floyd, though not by name. He testified that she was "the lady she was working [at the] clinic for Michael Rappaport, I believe," to which the prosecutor asked, "At Stemmons?" The district court sustained Floyd's objection to this leading question and instructed the jury to disregard the answer. Basovich proceeded to testify that he had seen Floyd in one of the law offices, but that he couldn't remember more. A few moments later, the prosecutor asked Basovich the following question: "When you were asked who your contacts were at various places, you said at one of the clinics Melina Floyd was your contact. Do you know her?" Floyd objected and correctly pointed out to the district court that Basovich had never before mentioned Floyd by name, let alone testified that she was his contact. The district court sustained Floyd's objection. Basovich went on to testify that he had discussed Floyd with his bosses and that she was the person who took care of whatever was done at the clinic for people who really didn't need any therapy. On cross-examination, Basovich testified that he would not have known Floyd's name if it hadn't been told to him and that he had never spoken with her before.

After reviewing the record, we find that the magnitude of the prejudicial effect of the prosecutor's improper remarks, while not slight, clearly did not rise to the level of denying Floyd a fair trial. Any prejudice stemming from the first leading question was mitigated by the district court's cautionary instruction to the jury. In addition, prejudice was further mitigated by Floyd's cross-

prosecutorial comments. Thus, we will review it as such.

6

examination of Basovich. Finally, as we will outline below, evidence of Floyd's guilt, provided by numerous witnesses other than Basovich, was extensive. For these reasons, we find no reversible error in the prosecutor's leading question and improper remark.

III.     Sufficiency of the Evidence

Floyd timely made, and renewed, a motion for judgment of acquittal. We review de novo the denial of her motion for judgment of acquittal. United States v. Myers, 104 F.3d 76, 78 (5th Cir. 1997). In conducting our review,

> We will affirm the jury's verdict if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict. Our review of the sufficiency of the evidence does not include a review of the weight of the evidence or of the credibility of the witnesses.

Id. at 78-79 (citations omitted).

In order to prove conspiracy pursuant to 18 U.S.C. § 371, the Government must prove "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." United States v. Peterson, 244 F.3d 385, 389 (5th Cir. 2001). Floyd argues that the Government failed to prove that she knew the unlawful objective of the agreement, the second element. Floyd contends that she was only doing her job and that she never suspected staged accidents or any other illegal activity. Floyd further contends that she never received any money for her alleged role in the scheme.

After reviewing the record, we find that there was ample evidence from which a reasonable jury could find that she was guilty of conspiracy beyond a reasonable doubt. First, Hogue testified that Floyd was his contact at the Stemmons clinic and that Floyd asked him to arrange a phony accident for her. In addition, Maria del Carmen Moreno ("Moreno"), Julia Morales ("Morales"), and Eduardo Cazares Torres ("Cazares"), participants in a staged accident, testified that after the accident each went to the Stemmons clinic where they encountered Floyd. Moreno and Morales identified Floyd as the person who told them to return to the clinic around 20 times. Morales indicated that Floyd told her to return 20 times before she even saw the doctor. When Moreno, Morales, and Cazares tired of the visits, each testified that Floyd had them sign the sign-in sheet a number of times during their last visit. Moreno and Morales testified that Floyd had them do these multiple sign-ins using two or three different pens. Furthermore, Floyd's daughter-in-law Maria Martinez ("Martinez") testified that Floyd had assisted her in obtaining employment at one of the law offices involved in the scheme. Martinez testified that after a few months, she became suspicious of illegal activity at the law office. When she discussed her concerns with Floyd, Floyd indicated she should "be quiet, answer the phones, don't talk to anybody, and if the police ever come, just say you don't know anything." In this case, the jury ultimately chose to credit the testimony of the other witnesses over [Floyd's] and was well within its province to do so." Edmond v. Collins, 8 F.3d 290, 294 n.10 (5th Cir. 1993).

In order to prove mail fraud pursuant to 18 U.S.C. § 1341, the Government must show: "(1) a scheme to defraud; (2) use of the mails to execute the scheme; and (3) the specific intent to defraud." Peterson, 244 F.3d at 389. Floyd argues that the Government failed to show that she mailed something, caused another person to mail something, or that she intended to mail something,

8

through the United States Postal Service for the purpose of carrying out the scheme. As we explained in United States v. Duncan,

> As long as the mailing is part of the execution of the fraud or incident to an essential part of the scheme, the evidence is sufficient to sustain a conviction for mail fraud. . . . To cause a mailing, a defendant must act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though the use of the mails was not actually intended. As long as there is sufficient evidence to connect the defendant to the fraudulent scheme involving use of the mails, the defendant need not do any of the actual mailing.

919 F.2d 981, 990-91 (5th Cir. 1990) (internal quotation marks and citations omitted). We find that there was sufficient evidence in this case from which a reasonable jury could find Floyd guilty of mail fraud beyond a reasonable doubt.[6]

IV.    Sentencing

We review the district court's interpretation of the sentencing guidelines de novo and its factual findings for clear error. United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999).

A.    More Than Minimal Planning

Floyd argues that the evidence did not support a finding of more than minimal planning. Whether Floyd engaged in more than minimal planning is a fact question we review for clear error. United States v. Perrien, 274 F.3d 936, 940 (5th Cir. 2001). Commentary to the sentencing guidelines states that "'more than minimal planning' is deemed present in any case involving repeated acts over a period of time unless is it clear that each instance was purely opportune." U.S.S.G § 1B1.1 cmt. 1(f) (2000). We find that the district court had ample evidence from which to conclude

---

[6] In light of the fact that we have rejected each of Floyd's contentions of error in her convictions, we likewise reject her argument that cumulative error denied her a fair trial.

that Floyd engaged in "repeated acts on numerous occasions to carry out . . . this conspiracy." Thus, we hold that the enhancement for more than minimal planning was proper.

B.    Organizer, Leader, Manager, or Supervisor

Floyd argues that the district court erred in finding that Floyd's role in the scheme was that of an "organizer, leader, manager, or supervisor" pursuant to U.S.S.G. § 3B1.1(c) (2000). Specifically, Floyd contends that her role was limited to one clinic in a scheme involving numerous clinics, and that the evidence showed her minimal participation in directing "victims" to sign for treatments they did not receive. Floyd's attempts to downplay her role are unpersuasive. After reviewing the record, we find that the district court's finding that Floyd played an aggravated role was not clearly erroneous. Government witnesses testified that Floyd managed the Stemmons Clinic and that she directed the "victim" participants to sign for nonexistent treatments which were then used to support fraudulent insurance settlements.

C.    Due Process

Floyd asserts that the district court's enhancements to her sentence for more than minimal planning and her aggravated role violated her constitutional right to due process because these actions were not charged in the indictment, nor submitted to the jury. This argument is without merit. See, e.g., United States v. McIntosh, 280 F.3d 479, 484 (5th Cir. 2002) (noting that an argument such as the one made by Floyd is foreclosed by binding precedent); United States v. Doggett, 230 F.3d 160, 166 (5th Cir. 2001) ("The decision in Apprendi [v. New Jersey, 530 U.S. 466 (2000)] was specifically limited to facts which increase the penalty beyond the statutory maximum, and does not invalidate a court's factual finding for the purposes of determining the applicable Sentencing Guidelines.").

D.    Previous Criminal Conviction

10

The PSR assessed Floyd as being in Criminal History Category II. Specifically, the PSR allocated Floyd one point for a prior conviction for forgery in California state court and two points for committing the instant offense while she was on probation for the forgery conviction. According to the PSR, Floyd pled guilty to forgery on February 14, 1992 and was sentenced to eighteen months probation. The PSR further indicated that the forgery case was dismissed on June 9, 1994. Floyd timely objected to the PSR and denied having a prior conviction. In response to Floyd's objections concerning her criminal history, the probation officer indicated in an addendum to the PSR that the information concerning the prior conviction was provided by the U.S. Probation Office in the Central District of California and that supporting documentation had been requested. At the sentencing hearing, the probation officer indicated to the district court that the criminal history part of Floyd's file was missing. She further stated that she had obtained a mug shot of the defendant in the California forgery case and that she had showed it to a fellow probation officer who had met with Floyd. According to the probation officer, the colleague had identified the mug shot as Floyd. The probation officer indicated that she had offered to show the mug shot to Floyd's attorney, but that never occurred. Finally, the probation officer stated that in her own view, after now seeing Floyd in person at the sentencing hearing, the mug shot was Floyd.

Floyd argues that the district court clearly erred by sentencing Floyd based on Criminal History Category II because the Government submitted no evidence to support its claim that she had a previous conviction. "As a general rule, information in the pre-sentence report is presumed reliable and may be adopted by the district court without further inquiry if the defendant fails to demonstrate by competent rebuttal evidence that the information is materially untrue, inaccurate or unreliable." United States v. Carbajal, 290 F.3d 277, 287 (5th Cir. 2002) (internal quotation marks omitted). This

11

rule, however, is not without its limits. The district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). As we have explained, "there must be 'an acceptable evidential basis' for the court's factfindings at the sentencing hearing." United States v. Rodriguez, 897 F.2d 1324, 1326 (5th Cir. 1990). The only evidence in this case from which the district court could have concluded that Floyd had a prior conviction was the unsworn statements of the probation officer. Neither the mug shot, nor any supporting documentation evidencing Floyd's conviction, was ever provided to Floyd despite her requests for them. In turn, this failure to provide any supporting documentation or the mug shot left Floyd unable to provide adequate and relevant rebuttal evidence. Accordingly, based on this record, we conclude that the district court erred in finding that Floyd had a prior conviction.[7]

## CONCLUSION

For the reasons outlined above, we AFFIRM Floyd's convictions, VACATE her sentence and REMAND for re-sentencing in accordance with this opinion.

AFFIRM in part, VACATE in part and REMAND for re-sentencing.

---

[7] Floyd alternatively argues that the district court erred in finding that she committed relevant conduct pertaining to the instant offense while she was on probation. See U.S.S.G. § 4A1.1(d) & cmt. 4. The record reflects that the Government put forth sufficient evidence at the sentencing hearing to show that Floyd's activities began during the probationary period. Thus, assuming that Floyd was in fact convicted of forgery on February 14, 1992 and sentenced to seventeen months probation, we find that the district court did not clearly err in finding that Floyd commenced the instant offense while she was on probation.