# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-40709

United States Court of Appeals
Fifth Circuit

**FILED**

May 12, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ADAN GUTIERREZ-MENDEZ, also known as Adan Gutierrez,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, SMITH, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A jury found Adan Gutierrez-Mendez guilty of conspiring to harbor illegal aliens and harboring illegal aliens for commercial advantage or private financial gain. He appeals, challenging the admission of certain bad-act evidence under Federal Rule of Evidence 404(b), the sufficiency of the evidence, and the sentence. We affirm.

No. 12-40709

I.

Two illegal aliens, Ada Coronado-Perez and Otilia Sebastian-Ramirez, testified that in early 2011, they paid to be smuggled into the United States. They were given the password "Parajon" in case they were questioned while traveling. Upon entry, they were captured and deported to Guatemala. Neither saw Gutierrez-Mendez during that entry.

They made a second attempt to enter in March 2011 and were again given the password "Parajon." At a stash house in Mexico, they met "Beto," who told them that he supervised the stash houses in Mexico that belonged to Parajon. A group of about twenty-five aliens, including Coronado-Perez and Sebastian-Ramirez, later crossed the river on small rafts. When they reached a highway, a man picked up the whole group in a truck and said that only the Parajon group, which included Coronado-Perez and Sebastian-Ramirez, would continue. The Parajon group (about twelve aliens) were then taken to a house.

There were three women in the Parajon group: Coronado-Perez, Sebastian-Ramirez, and an injured woman traveling with her family. The woman in charge of the house instructed the women to get ready to leave. The injured woman stayed behind, and Beto picked up the other two. Before Sebastian-Ramirez got into Beto's car, Beto told Coronado-Perez that she would need to "behave" if she wanted things to continue to go well. Beto drove them to a trailer about twenty minutes away, where he took the women's shoes and then introduced them to "Parajon" and "Chano." Beto told them that Parajon was the boss of all of the smuggling houses in the United States. At trial and during a photo lineup shortly after the incidents that follow, both women identified Gutierrez-Mendez as "Parajon."

Beto and Chano told the women that they would leave the next morning at four o'clock. Gutierrez-Mendez said he would go ahead of them and act as a

lookout.  He asked Coronado-Perez whether she had paid the money she owed for her first entry, telling her she now owed $6,000.

The men gave the women several alcoholic drinks, and Gutierrez-Mendez instructed the women to tell him, the boss at the trailer, if the other men did not respect them.  Later that night, Beto and Chano sexually assaulted the two women.

The next morning, either Gutierrez-Mendez or Beto told Sebastian-Ramirez that they would not be going to their next location that day but would do so the next day.  After the three men left the trailer, the women fled to a nearby house and told the owner that they had been threatened and kidnaped. The women were crying and seemed very scared.  Sebastian-Ramirez called her brother, Juan Lopez, to come help; the two women assisted him in verifying the location of the trailer.  Juan Lopez then called Police Officer Julio Barajas to come to his house.  There, the women told Barajas what had happened and pointed out the location of the trailer on a cellphone GPS.

The government also called a sheriff's captain, Brandon Torres, to testify about a 2009 traffic stop involving Gutierrez-Mendez.  Before trial, the government gave Gutierrez-Mendez notice under Rule 404(b) of its intent to introduce Torres's testimony to prove that Gutierrez-Mendez had previously transported two illegal aliens in 2009, ostensibly to prove his "intent" in 2011.  Over his objection, the court ruled that Torres's testimony was admissible.

Torres testified that in June 2009, he pulled over Gutierrez-Mendez for driving on the wrong side of the road, which was a major corridor for drug and human smuggling.  He noticed two passengers, one lying in the back in such a way that Torres thought she was trying to conceal herself.  When Gutierrez-Mendez lowered the driver's side window, Torres "smelled a foul odor of human sweat."  The prosecution then asked Torres about the significance of the sweat

smell: "And based on your experience, your four years working in [that county], that odor was consistent with what?" Torres answered, "Human smuggling."

Torres asked Gutierrez-Mendez about his passengers, and Gutierrez-Mendez explained that he saw them outside a church while he was driving up a highway. But, according to Torres, it would be impossible to see that church from the highway. Gutierrez-Mendez became nervous and unresponsive once Torres pointed that out to him. Torres then interviewed the two women passengers, who identified themselves in Spanish as aliens from Mexico. Gutierrez-Mendez was not arrested or prosecuted for any crime in regard to the 2009 incident.

Gutierrez-Mendez testified that in or around December 2010, Beto called him from McAllen, Texas, to tell him that he and Chano had work. He thought it odd that the two men called him because he did not know them very well. Nonetheless, he told them that he was interested in work and that he had heard that they were going to be harvesting onions. He had never heard of Chano's or Beto's being involved in illegal activity.

Chano and Beto later told him, while the three of them were at a trailer, that they "wanted for [him] to go in front because they wanted to bring some people in." Gutierrez-Mendez refused to participate because he remembered the 2009 incident and a warning from immigration officers that he would be arrested if caught transporting illegal aliens. He denied seeing Coronado-Perez or Sebastian-Ramirez at the house trailer. He left for Houston the same night, and neither Beto nor Chano called him again.

In rebuttal, the government called Adrian Olivarez, an immigration special agent, who testified that he spoke with Gutierrez-Mendez on December 12, 2011. Gutierrez-Mendez told Olivarez that he met Beto at a Walmart in Mission, Texas; that two women were with Beto; that Beto asked whether Gutierrez-Mendez would scout for law enforcement while Beto transported the

No. 12-40709

women to his trailer; that Gutierrez-Mendez had agreed to act as a scout while Beto transported the women; that he was at the trailer with Beto, Chano, and two women; and that after Gutierrez-Mendez left the trailer, Chano called and informed him that the women had escaped.

The jury found Gutierrez-Mendez guilty of one count of conspiring to harbor illegal aliens and two counts of harboring illegal aliens for commercial advantage or private financial gain. He was sentenced to 120 months on each count.

## II.

Gutierrez-Mendez maintains that the admission of Torres's testimony was an abuse of discretion. Specifically, Gutierrez-Mendez claims that the 2009 traffic stop was not relevant to prove his "intent" in harboring the two aliens but instead was relevant only to prove his criminal propensity and therefore inadmissible under Rule 404(b).[1] He further contends that, even if relevant to prove intent, Torres's testimony was unfairly prejudicial and nevertheless inadmissible under Federal Rule of Evidence 403.[2] Finally, he avers that the government failed to provide sufficient evidence that a relevant bad act even occurred, rendering Torres's testimony inadmissible under Federal Rule of Evidence 104(b).[3]

---

[1] "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1).

[2] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

[3] "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." FED. R. EVID. 104(b).

5

No. 12-40709

A.

Generally, Rule 404(b)(1) excludes "evidence of a person's past misdeeds if the sole value of such evidence is to prove the existence of a trait of character, and, from that trait, an inference of particular conduct."[4]  The rule then provides what is mistakenly described as an "exception" to this general bar on propensity evidence:  Evidence of a crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  FED. R. EVID. 404(b)(2).[5]

"We apply an abuse-of-discretion standard in reviewing . . . evidentiary rulings [, which] is heightened when evidence is admitted under [Rule] 404(b), because evidence in criminal trials must be strictly relevant to the particular offense charged."  *United States v. Kinchen*, 729 F.3d 466, 470 (5th Cir. 2013) (internal citations, quotation marks, and alterations omitted).  In truth, our actual review is more complicated and includes four different inquiries.

First, because prior bad act evidence is only "conditionally relevant," we have to ascertain whether the jury was presented with sufficient evidence that the putative bad act actually occurred.  If not, then testimony as to it would be irrelevant under Rule 104(b), and it would have been error to admit it.  *See Huddleston v. United States*, 485 U.S. 681, 692 (1988).

Once we have addressed conditional relevance, we apply the two-part

---

[4] DAVID P. LEONARD, THE NEW WIGMORE: EVIDENCE OF OTHER MISCONDUCT AND SIMILAR EVENTS ("WIGMORE") § 1.2.

[5] *See* WIGMORE § 4.4 n.2 and accompanying text, collecting sources (all non-authoritative) that mistakenly describe Rule 404(b)(2) as comprising "exceptions" to the propensity bar.  The reason that characterization is questionable is that a jury is still prohibited from inferring, from evidence of past conduct, that the defendant has a particular propensity and further inferring that he acted in accord with that propensity in making whatever finding it is charged with making, including *mens rea*.

No. 12-40709

*Beechum* framework.[6] We ask whether the challenged evidence was relevant for any purpose other than proving the defendant's propensity to commit crimes. If so, we then assess whether the court abused its discretion under Rule 403 when it determined that the unfair prejudice associated with the Rule 404(b) evidence did not substantially outweigh its probative value.

If the government presented sufficient evidence that the bad act occurred, if it is relevant to something other than character, and if its probative value was not substantially outweighed by its unfair prejudice, then the evidence was admissible, and the district court did not err. If, however, any of these three conditions is not met, the evidence was inadmissible, and we must assess whether the error affected Gutierrez-Mendez's substantial rights under the harmless-error rule. *See* FED. R. CRIM. P. 52(a).

B.

Indeed, at least one of the three conditions is not met, so we need address it to the exclusion of the others. Gutierrez-Mendez correctly claims that the Rule 404(b) admission was erroneous because the government failed to provide sufficient evidence that a relevant bad act had even occurred. In *Huddleston*, 485 U.S. at 685–91, the Court held that Rule 404(b) bad-act evidence is subject to Rule 104(b) on conditional relevance. Under Rule 104(b), evidence is admissible only if there is "evidence sufficient to support a finding" that the alleged conduct actually occurred. *See* WIGMORE § 4.5.1 (discussing *Huddleston*). "The court . . . examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston*, 485 U.S. at 690.

---

[6] *See United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

No. 12-40709

1.

Complicating our inquiry is that it is not entirely certain *what* bad act the jury was meant to find.  The record is unenlightening.  At a pretrial conference, the district court seemed to say that the evidence would be admissible to prove knowledge, an element of the charged offense.  But at trial, the court instructed the jury that it could consider the traffic-stop testimony "for the limited purpose of determining whether or not the Defendant had the necessary state of mind or intent to commit the offenses for which he is charged."[7] None of that, however, reveals what the actual relevant bad act was; there appear to be three candidates for that.

First, it could be that the prior bad act was the traffic infraction (driving on the wrong part of the road).  At oral argument, the government seemed to suggest at one point that the infraction was proven by sufficient Rule 104(b) material.  Yet, there is no imaginable relationship between an illegal traffic maneuver in 2009 and an alleged instance of human trafficking in 2012; that cannot be the "bad act" the evidence was meant to prove.

Second, it could be that Gutierrez-Mendez had systematically engaged in human trafficking using a truck that, by the time of the 2009 traffic stop, had started to smell of human sweat.  The only evidence for such a proposition was Torres's testimony that the vehicle smelled of sweat, so we hesitate to assume that was the relevant bad act to be proven.

The government, at oral argument, seemed to absolve us of having to pursue this troubling second theory when it stated that the relevant bad act was just that Gutierrez-Mendez was knowingly harboring the two particular

---

[7] The jury charge was expanded to include both intent and "whether the defendant acted according to a plan or in preparation for commission of a crime."  The "plan" language, though, seems a misfit, the traffic stop neither bearing any similarities to the methods used in the charged offense nor evincing preparation for it.  *See generally* WIGMORE § 9.1.

No. 12-40709

women that were in his vehicle in 2009. So, we must determine whether the 2009 stop could lead a jury to find by a preponderance of evidence that Gutierrez-Mendez intentionally harbored the two women in 2009, knowing that they were illegal aliens.

2.

We know of eight published decisions from this court resolving the conditional relevance of Rule 404(b) evidence, four ruling in each direction.[8] In *Beechum*, the question was whether the defendant unlawfully possessed a pair of gift cards with the intent to deprive the owners of them permanently. The en banc court held that there was sufficient evidence for the jury so to find:

> Beechum possessed the credit cards of two different individuals. Neither card had been signed by the person to whom it was issued. When asked about the cards, Beechum answered first that the only cards he had were his own. When confronted with the credit cards, which were obviously not his own, Beechum responded that they had never been used. He refused to respond further because the inspector "had all the answers." The logical inference from this statement is that Beechum was attempting to mitigate his culpability, having been caught red-handed. The undisputed evidence indicated that he could have possessed the cards for some ten months. The jury would have been wholly justified in finding that Beechum possessed these cards with the intent permanently to deprive the owners of them.

*Beechum*, 582 F.2d at 916. *Beechum* is probably the most helpful of the four

---

[8] In most cases, the proffered evidence will obviously be relevant under Rule 104 because it will involve past convictions or uncharged conduct that undeniably occurred. The following cases are only those in which there was a real Rule 104(b) dispute.

Decisions finding proffered Rule 404(b) evidence relevant under Rule 104(b) include *Beechum*, 582 F.2d at 916; *United States v. Heard*, 709 F.3d 413 (5th Cir. 2013); *United States v. Floyd*, 343 F.3d 363 (5th Cir. 2003); and *United States v. McCarthy*, 36 F.3d 1349 (5th Cir. 1994). Cases going the other way on conditional relevance of Rule 404(b) evidence include *United States v. Sumlin*, 489 F.3d 683 (5th Cir. 2007); *United States v. Ridlehuber*, 11 F.3d 516 (5th Cir. 1993); *United States v. Jimenez*, 613 F.2d 1373 (5th Cir. 1990); and *United States v. Brown*, 608 F.2d 551 (5th Cir. 1979).

cases to the government.[9]

Gutierrez-Mendez urges that *Sumlin* is the closest case, but its reasoning is difficult to apply. It involved unlawful possession of a firearm by a convicted felon. The prosecutor presented testimony from the arresting officer that he suspected that the defendant was transporting narcotics because the body of his car had several loose screws, he found a single alleged marihuana cigarette, and a canine unit alerted to the front and driver's side of the vehicle. A search of the car found no drugs. What any of that had to do with the felony-possession charge is lost on us, as it was on the district court:

> After the prosecutor elicited the aforementioned testimony, the district judge, at the bench, said to him: "What's the charge in this case? Possession of a firearm by a felon? This is a bunch of nonsense you're going into. All the search didn't reveal any drugs. All you're talking about is drugs. I'm going to declare a mistrial in this case in about five seconds."

*Sumlin*, 489 F.3d at 686. For obvious reasons, we found the testimony insufficient to prove that the defendant had committed the extrinsic act of drug transportation. *Id.* at 691.

Though Gutierrez-Mendez relies on *Sumlin*, it is the other cases that are most helpful to him, in particular *Ridlehuber*. There, we held that the defendant's possession of chemicals, thermometers, tubing, a Pyrex funnel, rubber stoppers, and the fact that his residence "smelled like a drug lab" was not enough under Rule 104(b) to prove that he was involved in the manufacture of

---

[9] *Heard* involved whether the defendant had engaged in bankruptcy fraud; the government presented direct evidence that he owned a corporation that he did not disclose in bankruptcy and that although he listed his income at $9,000 per year during the relevant period, he actually contributed between $70,000 and $90,000 to buy a house. *Heard*, 709 F.3d at 430–31. In *Floyd*, the government presented testimony from a co-conspirator that the defendant had engaged in an intricate fraud involving medical billing. *Floyd*, 343 F.3d at 368–69. *McCarthy* involved only circumstantial evidence of two burglaries but quite a damning amount of it. *See McCarthy*, 36 F.3d at 1354.

methamphetamine. *Ridlehuber*, 11 F.3d at 523.[10]

The facts here are somewhere between *Ridlehuber* and *Beechum*. On the one hand, *Beechum* involved unsigned gift cards made out to someone other than the defendant who had them in his wallet. Here, by contrast, it is not obvious that Gutierrez-Mendez should have known that the women he was giving a ride to were illegal aliens. His apparent inability to provide a sturdy explanation for how he picked up the women, however, contrasts with the legitimate business explanation the defendant in *Ridlehuber* gave for why he possessed the ostensible hallmarks of a smelly lab. *Beechum*, though, involved a defendant who, for ten months, apparently held onto the gift cards made out to other persons. Here, by contrast, the government has not provided any evidence that Gutierrez-Mendez had known the women any longer than it took to pick them up or that he knew they were in the United States unlawfully.

On balance, the facts here seem decidedly closer to those of *Ridlehuber* than to those of *Beechum*. If the facts were insufficient for a jury to conclude by a preponderance of the evidence that the defendant in *Ridlehuber* was intentionally making meth, the facts here must be insufficient for a jury to conclude by the same standard that Gutierrez-Mendez was intentionally harboring illegal aliens in 2009.

In sum, the government presented insufficient evidence that Gutierrez-Mendez knowingly harbored illegal aliens at the time of his 2009 traffic stop. Under Rule 104(b), Torres's testimony should have been excluded.

---

[10] *Brown* involved alleged child abuse by a military-base resident. The court held that the prosecutor could not admit evidence that the same child—the defendant's two-year-old son—had been admitted to a base hospital suffering several multiple bruises because it had submitted no evidence that the defendant was the cause of those injuries. *Brown*, 608 F.2d at 555. *Jimenez* appears to hold that merely finding cocaine in a room that the defendant may have shared with someone else, without more, was insufficient for a jury to find that he had illegally possessed the cocaine. *Jimenez*, 613 F.2d at 1376.

No. 12-40709

C.

Because the bad-act evidence was erroneously admitted, we address the government's claim that it was harmless. Under Rule 52 of the Federal Rules of Criminal Procedure, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." "An error is harmless when it does not affect the substantial rights of a party. The government has the burden of establishing harmlessness beyond a reasonable doubt." *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008). It has satisfied that burden.

Even excluding the impermissible Rule 404(b) material, the evidence of guilt was overwhelming. Both of the female victims gave consistent accounts of Gutierrez-Mendez's involvement in the enterprise that brought them into the United States. During both of their initial attempts to enter, they were given the password "Parajon" to use should they encounter trouble at the border. They received the same password on their later entry (leading to the events of this case). They met each other after they were combined into a large group of "Parajon's" people. The "Parajon" women—ultimately just the two victims—were segregated and taken to the trailer in McAllen, where they ultimately met "Parajon," whom they both identified as Gutierrez-Mendez in court and during a photo lineup after the police began their investigation.

Gutierrez-Mendez told both women that he was in charge of the operation's houses in the United States; he explained the plans to complete their journey into Houston; and he informed one of them that she owed him money for his endeavors. He told both women that if either of the other two men at the trailer "disrespected" them, they needed to tell him because he was the boss of the house. After the women were sexually assaulted, he informed the women that they would not be going to Houston that morning after all but possibly the following day.

12

No. 12-40709

Olivarez's testimony, offered in rebuttal, supported that testimony. He stated, among other things, that Gutierrez-Mendez met two girls at a trailer with Beto and Chano, the latter of whom informed Gutierrez-Mendez that the two women had escaped. Olivarez's testimony was admissible both to impeach Gutierrez-Mendez's contrary testimony and as substantive proof of Gutierrez-Mendez's guilt. *See* FED. R. EVID. 801(d)(2).[11]

Also, the impermissibly admitted evidence was too weak and benign to give us concern that it affected the verdict. As compared to the charged offense and its attendant circumstances (including the sexual assaults of the two victims), the June 2009 traffic incident is insignificant. Furthermore, just being caught driving two illegal aliens bears little resemblance to the intricate web of a conspiracy described to the jury for the charged offense, reducing even the likelihood of an impermissible propensity inference. Also, the weakness of the evidence of the government's story (*viz.*, the very thing that made the evidence impermissible under Rule 104(b)) reduced the chances that the jury would have even thought that something illegal happened in 2009. Finally, the multiple limiting instructions further reduced whatever risk remained of unfair prejudice as to the Rule 404(b) materials. *See Wright*, 634 F.3d at 775. The error was harmless.

## III.

The district court applied three sentencing enhancements, all related to the co-conspirators' sexual assaults of the two victims: U.S.S.G. § 2L1.1(b)(5) for brandishing a dangerous weapon (namely, a knife); § 2L1.1(b)(6) for intentionally or recklessly creating a substantial risk of serious bodily injury; and

---

[11] The state of the record elucidated here also meets Gutierrez-Mendez's arguments as to the sufficiency of the evidence to support the conviction.

No. 12-40709

§ 2L1.1(b)(7) for causing substantial bodily harm.  Gutierrez-Mendez chal-
lenges the sentence on two bases.  First, he contends that the court had insuf-
ficient evidence from which to find that he could be held responsible for the
knife-point sexual assaults.  Second, he maintains that the court misinter-
preted Comment 5 to § 2L1.1(b)(6) in such a way that it impermissibly double-
counted enhancements under subsections (b)(5) and (6) for the same conduct.

A.

Regarding sufficiency, the evidence, according to the presentence report
("PSR"), is that when the women refused to have sex with Gutierrez-Mendez's
co-conspirators, they drew a knife on each of them and sexually assaulted
them.  The court adopted the factual finding in the PSR that—although
Gutierrez-Mendez did not personally brandish a weapon or sexually assault
the women—it was "reasonably foreseeable" that his co-conspirators might.[12]
The court gave a detailed explanation for its finding of foreseeability:

> As to the dangerous weapon that—the Court recognizes that it was
> not Mr. Gutierrez who used that but that it is reasonably foreseeable
> under all of the circumstances here that that would occur as a result of
> what we have here.  And I'll begin with what I've touched on already,
> that is that, you know, we have ten aliens belonging to this Defendant
> to begin with, the women are separated out and they're separated out
> with the exception of the one who is traveling with her husband and
> apparently has been injured.
>
> And they are taken to a trailer house that is not what we know to be
> a common stash house.  This is a very different setting. It is a little
> unusual to remove a group who are at, you know, what we all generally
> describe as a stash house and take them to this type of setting.  This is
> a trailer home where the—you know, the other two are, that is, the

---

[12] *See* U.S.S.G. § 1B1.3(a)(1)(B) (stating that relevant conduct for a guideline calcula-
tion includes "all reasonably foreseeable acts and omission of others in furtherance of the
jointly undertaken criminal activity"); *United States v. Williams*, 610 F.3d 271, 292 (5th Cir.
2010) (same).

individual identified as Chano—referred to by Chano and is Marciano Gomez and this other individual identified as Beto.

The circumstances there, I think, to begin with are very suspect because you do not have them being housed in another stash house. They're being housed in what appears to be, for all practical purposes, somebody's, you know, home where they live and under very unusual circumstances to begin with when they go there.

Generally speaking, you have material witnesses there. Even if they are housed in somebody's home, which occasionally we do have a home that's a full home also being used as a stash house but seldom are they integrated within that home itself. There may be a bedroom separated for them. There may be out buildings separated out for them but in this instance, they are basically given, you know, a bedroom to sleep in.

The Court believes that the whole setup to begin with, you know, taking them to the home, having this little barbecue, encouraging them to drink, segregating them one from the other so that they sleep in separate bedrooms is from beginning intended to be a set up to have them either have consensual sex if they were willing to go along with them but if not, to have sex under the circumstances that developed here as to one material witness didn't quite develop as to the other but that this is part of the manner in which this operation worked because all the circumstances are that that was the intent from the moment that they were taken care of, that in that respect, the fact that Mr. Gutierrez was present throughout this whole evening and next—part of the next morning, that there was discussion about who would be sleeping with whom.

During some part of the evening when Mr. Gutierrez was present, that at one point in time Mr. Gutierrez tells the material witnesses that if they are disrespected that they should let him know and I think that was already a signal that they were expected to have sex, that it would not be any kind of, I guess in his opinion, a violent act. Nonetheless, I think forcing anybody into sex regardless of the circumstances is a violent act but that that was intended to begin with so that under all of those circumstances, I do believe that it is reasonable—reasonably foreseeable that an individual would use some sort of weapon—in this case, that was a knife—to coerce the material witness into having sex. So the Court believes that that adjustment is also warranted.

A finding of "reasonable foreseeability" is a finding of fact that we review for

No. 12-40709

clear error. *United States v. Lghodaro*, 967 F.2d 1028, 1030 (5th Cir. 2002).

The district court, in the above passage, was relying on testimony from the two victims as well as the much more detailed PSR. Gutierrez-Mendez had the burden of proving the PSR unreliable and materially untrue. *United States v. Betancourt*, 422 F.3d 240, 248 (5th Cir. 2005). "If no relevant affidavits or other evidence is submitted to rebut [the PSR], the court is free to adopt its findings without further inquiry or explanation." *United States v. Reasor*, 541 F.3d 366, 369 (5th Cir. 2008); *United States v. Alaniz*, 726 F.3d 586, 619 (5th Cir. 2013). Self-serving statements are insufficient to meet the defendant's burden. *See United States v. Londono*, 285 F.3d 348, 355 (5th Cir. 2002); *United States v. Slaughter*, 238 F.3d 580, 585 (5th Cir. 2000). Nor do mere objections to the PSR suffice as competent rebuttal evidence. *Alaniz*, 726 F.3d at 619; *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002).

Gutierrez-Mendez offered nothing more than his self-serving statements of innocence and mere objections to the PSR.[13] Plainly, he has not met his heavy burden of proving clear error in the factual findings, and we accordingly find no error in the § 2L1.1(b)(5) and (7) enhancements. Whether we can also affirm as to the subsection (b)(6) enhancement requires us to address Gutierrez-Mendez's final contention.

B.

Section 2L1.1(b)(5) calls for a four-level enhancement (or an enhancement to level 20) "if a dangerous weapon . . . was brandished or otherwise used." Section 2L1.1(b)(6) calls for a two-level enhancement (or an enhancement to level 18) if the offense "involved intentionally or recklessly creating a

---

[13] In those objections, Gutierrez-Mendez generally asserted that he was innocent of the crimes and that the PSR's claims about his involvement were not true.

substantial risk of . . . serious bodily injury to another person," including a sexual assault. The Official Commentary to § 2L1.1 (specifically Comment 5) provides that courts shall not "apply the adjustment in subsection (b)(6) if the only reckless conduct that created a substantial risk of death or serious bodily injury is conduct for which the defendant received an enhancement under subsection (b)(5)."

Gutierrez-Mendez avers that the court applied both subsections (b)(5) and (6) to the same conduct, namely the rape and attempted rape at knifepoint. The government presses a theory that there is no double-counting because subsection (b)(5) focuses on *conduct* (the brandishing of the firearm), but subsection (b)(6) focuses on *results* (the creation of a substantial risk of serious bodily injury). This is the most difficult to resolve of Gutierrez-Mendez's sentencing issues, dealing with an open question in this circuit, but we need not decide it.

The district court explained that it would have given Gutierrez the same sentence (*viz.*, the statutory maximum) even if it was mistaken in its application of the guidelines:

> [I]n the event that the Court is in error as to the calculation and any one or more than one of the enhancements should not have been applied, the Court nonetheless considers the circumstances here as the Court has already touched on them, that the Court believes that this was part of your—to use a term and used often in criminal cases, part of your modus operandi, that you involved yourself in the trafficking of aliens and that as part of that, you—I hesitate to find the right word —I'm not sure that it is authorized or encouraged, permitted or had as a part of your manner of operation the sexual abuse of the aliens—the female aliens within the group.
>
> So the Court believes that even if the Guideline range the Court has not correctly applied the enhancements here, that based on the circumstances present here, that is, that you purposely removed these two females from the group of the other aliens that were part of your group, that you isolated them to a location where it would be difficult for them

17

No. 12-40709

to have protection, that you set it up such that they would be sexually assaulted, that that warrants a sentence at the high end of the statutory limit here of 120 months.

We recently reasoned that, as an alternative basis for affirmance, a similar statement rendered harmless any putative error in the application of the guidelines.[14]  *Richardson*, which is binding precedent, is indistinguishable from this case in regard to the sentencing issue.

The judgment of conviction and sentence is AFFIRMED.

---

[14] *Compare United States v. Richardson*, 713 F.3d 232, 234, 237 (5th Cir.), *cert. denied*, 134 S. Ct. 230 (2013) ("The district court stated that even if its calculation under the guidelines was incorrect, it would still impose the same sentence.") (internal brackets, quotation marks, and citation omitted) *with United States v. Delgado-Martinez*, 564 F.3d 750, 754 (5th Cir. 2009) ("[I]t appears that the court consciously selected from the low end of what it believed to be the available range. . . .  Under these circumstances, we cannot conclude that the district court had the 30-month sentence in mind and would have imposed it, notwithstanding the error made in arriving at the defendant's guideline range."). *Richardson* is consistent with at least one of our other recent decisions, *United States v. Reyes-Guzman*, 519 F. App'x 317, 317 (5th Cir.), *cert denied*, 134 S. Ct. 356 (2013).